UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KHALIL WILSON,

                  Petitioner,

v.

UNITED STATES OF AMERICA,

                  Respondent.

_____/

Criminal Case Number 18-20084
Civil Case Number 19-13700
Honorable David M. Lawson

## OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE

Petitioner Khalil Wilson pleaded guilty to assault and attempted murder in aid of racketeering and discharging a firearm during a crime of violence after he and codefendant Martez Bailey drove by and shot at the house of a rival gang member. A woman in the house suffered a gunshot wound. Wilson was sentenced to 120 months on the racketeering convictions plus another consecutive ten-year term for the firearm offense. He filed a notice of appeal but subsequently dismissed it.

Wilson now moves to set aside his sentence and conviction, raising several arguments attacking the legal and factual bases for his convictions and arguing that his trial lawyer was constitutionally ineffective because he did not explain the charges to him and failed to raise certain legal arguments. He also says that his sentence was calculated incorrectly. Several of Wilson's claims are foreclosed because he did not raise them on direct appeal. The record shows that Wilson received a full explanation of the charges and accompanying penalties, and the issues he wanted his lawyer to raise are meritless. And his argument that his sentence was not calculated correctly by the Bureau of Prisons is not before this Court properly. Wilson's rights were not abridged; therefore, his motion to vacate his sentence will be denied.

I.

Wilson was charged in a five-count indictment with attempted murder in aid of racketeering (count 1), assault with a dangerous weapon in aid of racketeering (counts 2 and 3), discharging a firearm in furtherance of a crime of violence (count 4), and making false statements to a law enforcement official (count 5). The charges arose from the defendant's membership in the "Band Gang." The Band Gang was formed in 2013 through the merger of four other local Detroit street gangs. At the height of its influence, the Band Gang operated throughout a substantial swath of territory on the west side of Detroit.

At his plea hearing, Wilson admitted the following facts. The defendant was a member of Band Gang, which had around 20 members. Plea Hrg. Tr., ECF No. 67, PageID.311-12. One of the gang's principal activities was trafficking in stolen credit cards, which were used by gang members to purchase goods that then would be sold for cash. *Id.* at PageID.315. The purchases of goods involved items that were made around the United States, in states other than Michigan. *Ibid.* Sometime in early or mid-June 2016, members of a rival gang shot up Wilson's mother's house. *Id.* at 312. Wilson resolved to shoot up the house of the rival gang members in retaliation for the attack. *Ibid.* He stated that he decided to retaliate to halt the aggression by the rival gang and ensure that similar attacks would not occur in the future. *Id.* at PageID.314-15. To strike back, the defendant aided other gang members in going to the house of their gang rivals, where members of Band Gang other than Wilson shot at the rivals' residence. *Id.* at PageID.311-12. Wilson knew when firearms were discharged into the rival gang members' home that persons could be seriously injured. *Id.* at 316.

Wilson pleaded guilty to counts 1, 3, and 4 of the indictment under an agreement with the government that it would dismiss the remaining counts. On January 29, 2019, Wilson was

sentenced to concurrent prison terms of 120 months on count 1 and 3. He also received a consecutive 120-month prison sentence on count 4, the firearm count. He filed a notice of appeal, but on August 19, 2019, the court of appeals issued an order granting the defendant's motion for voluntary dismissal of the appeal. On November 28, 2019, the defendant filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. Over the course of the next several years, the defendant filed more than 17 cumulative "addendums" and "supplements" to the motion, along with several other motions for various forms of relief which were denied. The government filed an initial response and seven supplemental responses addressing additional arguments raised in the defendant's cumulative filings.

II.

A federal prisoner challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). And he "must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998) (holding that "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review"); *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (reaffirming that "[s]ection 2255 is not a substitute for a direct appeal, and thus a defendant cannot

use it to circumvent the direct appeal process"). Moreover, when a defendant fails to raise an issue at trial or on direct appeal, that issue is generally forfeited. *See Huff v. United States*, 734 F.3d 600, 605-06 (6th Cir. 2013). A claim that would otherwise be forfeited may be raised through a collateral attack under § 2255 if a defendant "can demonstrate cause and prejudice to excuse his default." *Id*. at 606. "Ineffective assistance of counsel can constitute cause for a procedural default." *Ibid*.

And a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). A claim of ineffective assistance of counsel itself is properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

In his opening motion and various supplements, Wilson raised the following challenges to his convictions and sentence: (1) the conviction for using a firearm during and in relation to a crime of violence is constitutionally defective under the holding of *Rehaif v. United States*, --- U.S. ---, 139 S. Ct. 2191 (2019); (2) the firearm conviction is constitutionally infirm under the rule of *Mathis v. United States*, 579 U.S. 500, 519 (2016); (3) the firearm conviction is constitutionally defective under the holding of *United States v. Woods*, 14 F.4th 544 (6th Cir. 2021); (4) trial counsel was ineffective by failing adequately to explain several elements of the charged offenses and how the government's evidence could prove those elements beyond a reasonable doubt at trial; (5) the government failed to establish facts demonstrating a nexus between the charged acts and interstate commerce; (6) the government failed to establish a factual basis demonstrating that the defendant committed the charged shootings in aid of racketeering for the purpose of maintaining or increasing his position within a racketeering organization; and (7) the BOP has failed properly

to assess credit for time served on sentences imposed in two other federal criminal matters and failed properly to compute the time to be served on the judgment in this case.

All of the claims raised in Wilson's collateral attack on his convictions and sentence, other than the ineffective assistance claims, are foreclosed because they were procedurally defaulted when he failed to raise them on direct appeal. Wilson could have raised all of the claims on direct appeal except for ineffective assistance, but he chose not to do so when he dismissed his appeal voluntarily. A motion under section 2255 may not do service for a direct appeal. *Regalado*, 334 F.3d at 528. Wilson also has failed to demonstrate cause (discussed more fully below), prejudice, or his "actual innocence" of the crime of conviction, as he must to overcome the procedural default of his claims. However, the government's opposition does not pursue the procedural default, but instead attacks the merits of the claims. Because the procedural issue makes no difference to the outcome, it is more efficient to address the merits.

### A. *Rehaif* Argument

The defendant argues that his firearm conviction under 18 U.S.C. § 924(c) is unconstitutional under *Rehaif v. United States*, --- U.S. ---, 139 S. Ct. 2191 (2019), in which the Supreme Court held that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Id.* at 2200. The holding of that decision is irrelevant to this case because *Rehaif* addressed whether the government must prove the defendant's knowledge of his status as a prohibited person to secure a conviction under 18 U.S.C. § 924(a), a statute not in play in this case. Wilson was not convicted of any status-based firearm offense. Instead, he was convicting of using a firearm during and in furtherance of a crime of violence under 18 U.S.C. § 924(c). *Rehaif* does not apply here.

B. *Mathis/Woods* Arguments

The petitioner argues that his firearm conviction is unconstitutional under the "modified categorical" analysis specified by *Mathis v. United States*, 579 U.S. 500 (2016). *See id.* at 519 ("For more than 25 years, we have repeatedly made clear that application of [the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1)] involves, and involves only, comparing elements. Courts must ask whether the crime of conviction is the same as, or narrower than, the relevant generic offense. They may not ask whether the defendant's conduct — his particular means of committing the crime — falls within the generic definition."). Wilson says that *Mathis* must be considered when determining whether he committed a qualifying "crime of violence" under 18 U.S.C. § 924(c).

However, *Mathis* does not address any issues involved in this case. First, the court of appeals, relying on *Mathis*, has held that the predicate crime of violence charged under section 1959 is a "divisible" statute defining several discrete crimes. *Manners v. United States*, 947 F.3d 377, 380 ("This statute is 'divisible' into different substantive offenses because it 'list[s] elements in the alternative, and thereby define[s] multiple crimes.'" (quoting *Mathis*, 136 S. Ct. at 2249)). Second, the court of appeals expressly has held that both assault with a dangerous weapon in aid of racketeering, 18 U.S.C. § 1959(a)(3), and attempted murder in aid of racketeering, 18 U.S.C. § 1959(a)(5), are valid predicate offenses for a conviction under 18 U.S.C. § 924(c)(3) (the so-called "elements" clause). *United States v. Woods*, 14 F.4th 544, 552-53 (6th Cir. 2021) ("The Woods brothers argue that the attempted murder in aid of racketeering under 18 U.S.C. § 1959(a)(5) ('[racketeering] attempted murder') charges and the assault with a dangerous weapon in aid of racketeering under 18 U.S.C. § 1959(a)(3) ('[racketeering] assault with a dangerous weapon') charges underlying their § 924(c) charges are not proper predicate offenses . . . . Substantive

charges like [racketeering] murder, on the other hand, rely on the elements clause, not the unconstitutionally vague residual clause. This is true whatever legal theory of liability the jury relies on to find the defendant guilty of § 924(c). . . . The Woods brothers' § 924(c) charges were properly based on crimes of violence under the § 924(c) elements clause.").

Wilson's contention that his conviction for using a firearm during and in furtherance of a "crime of violence" is unconstitutional cannot succeed because it squarely is foreclosed by the holding of *Woods*, since he was convicted of two crimes that unquestionably serve as valid predicates for the firearm charge. Wilson also argued that *Woods* itself bars his 924(c) conviction, but the *Woods* panel rejected the defendant's argument and held the opposite of Wilson's position here.

## C. Ineffective Assistance of Counsel

The defendant argues that his trial counsel was ineffective by failing to challenge the "interstate commerce nexus" and "reputational purpose" elements of the racketeering crimes and by failing adequately to explain the elements of the offenses and how the government's evidence would prove them.

An ineffective assistance of counsel claim is not easy to prove. A defendant must show that his attorney's performance was deficient, and that deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance meets the first element when "counsel's representation [falls] below an objective standard of reasonableness." *Id.* at 688. Wilson must show here "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Supreme Court has "declined to

articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair [proceeding] . . . whose result is reliable." *Strickland,* 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

In a federal habeas proceeding, that is, when adjudicating a motion under 28 U.S.C. § 2255 calling on the Court to weigh a claim of ineffective assistance, "[a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief" on his claim. *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (quotations omitted). "Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims," but "[a] petitioner's mere assertion of his innocence, without more, does not entitle him to an evidentiary hearing." *Ibid.* And where the record presents "considerable doubt" about the interactions of a petitioner and his attorney, the Court should conduct an evidentiary hearing to bring clarity to the proceedings. *See Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003). But where, as here, the existing record demonstrates no significant factual dispute, that the claims of ineffective assistance are unsupported, or that the petitioner has not met the applicable standard,

no hearing is required. *Goward v. United States*, 569 F. App'x 408, 412 (6th Cir. 2014). The record conclusively demonstrates that both of Wilson's claims of deficient performance are without merit.

### 1. Elements of Crimes

Wilson says that his attorney was ineffective because he failed adequately to explain the elements of certain crimes and the government's proofs that would be used to establish them at trial.

Generally, defense counsel has a duty to communicate to his client formal plea offers, advise him of the charges, and discuss the terms of tendered plea agreements. *See Missouri v. Frye*, 566 U.S. 134, 145 (2012). In this case, however, even if trial counsel came up short with that advice (which he did not), Wilson cannot demonstrate prejudice from any lack of information because all the elements of the charges were explained by the Court on the record, and the defendant admitted that he understood them.

At the plea hearing, the petitioner was asked if his attorney explained the elements of the crimes and the evidence that would be used to prove them, and he answered "Yes." Plea Hrg. Tr., ECF No. 67, PageID.292. Nevertheless, the Court thoroughly explained on the record all of the elements of the charges of assault with a dangerous weapon in aid of racketeering, attempted murder in aid of racketeering, and using a firearm during and in furtherance of a crime of violence. *Id.* at PageID.306-08. When asked if he understood all of those elements, Wilson answered, "Yes, I understand those." *Id.* at PageID.308. The petitioner indicated that he did not believe the government could prove that he "discharged" a firearm, but when it was explained that the firearm count was charged on a theory of aiding and abetting, Wilson admitted that the government could prove that he aided or abetted another person in discharging a firearm during and in furtherance of a crime of violence. *Id.* at PageID.309-10.

Wilson has put forth no evidence credibly calling into question the veracity of his statements on the record at the plea hearing. *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) ("[T]he representations of the defendant, his lawyer, and the prosecutor at [the plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity."). His claim on this ground must be rejected.

### 2. Interstate Commerce Nexus

There was sufficient evidence adduced at the plea hearing to establish the interstate commerce nexus element of the racketeering crimes. To establish a racketeering violation under section 1959(a), "the government must show: (1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *United States v. Woods*, 14 F.4th 544, 555 (6th Cir. 2021) (quotation marks omitted). "Under § 1959, an enterprise is defined as a 'partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.' 18 U.S.C. § 1959(b)(2). The enterprise must also be engaged in 'racketeering activity,' which includes 'any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . which is chargeable under State law and punishable by imprisonment for more than one year.'" *Id.* at 556 (quoting 18 U.S.C. §§ 1959(b)(1), 1961(1)).

When questioned about the interstate commerce element, Wilson admitted that the Band Gang was involved in credit card theft and identity theft, that it used stolen credit cards to buy

various goods to be sold for cash, and that in doing so the gang trafficked goods that had been sold in interstate commerce. Plea Hrg. Tr. at PageID.315 ("THE COURT: All right. And did the gang use those stolen credit cards to purchase goods and convert them into cash? THE DEFENDANT: Yes. THE COURT: All right. And to do that, they were involved in commerce of things that were manufactured around the United States; is that fair to say? THE DEFENDANT: Yes."). That testimony is sufficient to establish the *de minimis* connection with interstate commerce required to prove the existence of a RICO enterprise. *United States v. Rich*, No. 18-2268, 2021 WL 4144059, at *30 (6th Cir. Sept. 13, 2021) ("As set forth in *United States v. Riddle*, 'a *de minimis* connection suffices for a RICO enterprise that "affects" interstate commerce.' 249 F.3d 529, 537 (6th Cir. 2001)."). The petitioner's claim that the government failed to present sufficient evidence to establish an interstate commerce nexus is without merit.

3. Reputational Purpose

The petitioner also challenges the sufficiency of the evidence for the element of the racketeering crimes that required the government to prove that he engaged in the charged crimes for the purpose of maintaining or increasing his standing in the gang. "The [racketeering] statute does not extend to every violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang." *Woods*, 14 F.4th at 556-57 (citing *United States v. Ledbetter*, 929 F.3d 338, 358 (6th Cir. 2019); *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014)) (quotations and alterations omitted). "Put another way, a defendant is not guilty of a [racketeering] crime when he acts alone and with no apparent connection to the gang. Rather, [the statute's] purpose element is met if the jury could find that an animating purpose of the defendant's action was to maintain or increase his position in the racketeering enterprise." *Ibid.* "For example, a defendant may be liable if the violent crime was sanctioned by the gang and the defendant participated because he knew it was

expected of him as a member or the crime fit the mold of the gang's typical missions against rivals." *Ibid.* At the plea hearing, Wilson admitted facts sufficient to prove that the shooting assault committed against rival gang members was a violent act of racketeering undertaken by him to retaliate against members of a rival gang who "disrespected" him and endangered the petitioner's family by shooting at his mother's house. The following colloquy demonstrates that:

> THE COURT: Were you trying to save face? That is, I take it that when your mother's house got shot up, you felt not only threatened but disrespected; is that fair to say?
>
> THE DEFENDANT: Yes.
>
> . . .
>
> THE DEFENDANT: . . . I did it because he shot my house up. So I went back and shot his house up for my own self and for the sake of my family. I didn't do it for my gang, I did it for me.
>
> THE COURT: All right.
>
> . . .
>
> THE COURT: Did you have some concern that if you didn't retaliate, more of the same would happen to you?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And so you were going to try to end it right there by retaliating and basically staking out your claim; right?
>
> THE DEFENDANT: Yes.

Plea Hrg. Tr. at PageID.313-15. Protecting the reputation of one's own gang, "staking out a claim" for the gang, and halting aggression by rivals has been recognized by the Sixth Circuit as conduct that is exemplary of efforts by a gang member to maintain or increase his position in the enterprise. *Woods*, 14 F.4th at 557 ("Rhymes testified that it was important to HNIC to protect the gang's reputation and that HNIC members would engage in retribution in response to any perceived

disrespect. . . . Accordingly, there was sufficient evidence to conclude that the Woods brothers acted with the animating purpose of maintaining or increasing their position in HNIC.").

The evidence for both the interstate commerce nexus and reputational purpose elements was sufficient based on the petitioner's admissions at the plea hearing. Wilson cannot demonstrate prejudice for the claim that his lawyer failed to explain all of the elements of the crimes or the scope of the proofs where the record plainly shows that all of the elements were explained by the Court and the defendant said that he understood them. No further inquiry is necessary to settle the questions about whether the defendant's trial counsel was ineffective, and the defendant has failed to establish that relief is warranted on those claims.

### D. Time Served Credits

Wilson argues that relief from his sentence is warranted because the Bureau of Prisons has failed to calculate accurately his time to be served for overlapping sentences imposed in this case and in two other separate federal criminal prosecutions. The available information does not support that argument. More importantly, though, the claim is not properly before the Court since Wilson has not shown that he exhausted available administrative remedies to secure review and correction of his time served computation.

Any claim that the BOP failed to compute credit for time served on other sentences is not properly before the Court, because such computations are committed in the first instance to the Attorney General, not the Court. "The Supreme Court has held that the Attorney General, through the Bureau of Prisons, and not the district court, is authorized to grant a defendant credit for time served prior to sentencing under 18 U.S.C. § 3585." *United States v. Dowell*, 16 F. App'x 415, 420 (6th Cir. 2001) (citing *United States v. Wilson*, 503 U.S. 329, 335 (1992)). "Although a prisoner may seek judicial review of the computation of this credit under 28 U.S.C. § 2241, he

may do so only after he has sought administrative review and has exhausted all of his administrative remedies." *Dowell*, 16 F. App'x 415, 420 (6th Cir. 2001) (citing *Wilson*, 503 U.S. at 335; *McClain v. Bureau of Prisons*, 9 F.3d 503, 505 (6th Cir. 1993)). Where it is not shown that a federal prisoner has exhausted administrative challenges to the computation of his duration of confinement and application of credits for time served, this Court has "no authority to review [his] claim for sentencing credit." *Ibid.* (citing *Wilson*, 503 U.S. at 333; *United States v. Westmoreland*, 974 F.2d 736, 737 (6th Cir. 1992)).

Moreover, the available information does not suggest that there has been any miscomputation of the petitioner's time served or to be served. That is because, (1) with respect to counts one and three in this case, the maximum ending date of the 120-month concurrent sentence exceeds the ending date for both of the other sentences alluded to by the defendant, which were imposed in *United States v. Wilson*, No. 16-20724 (by Judge Cleland), and *United States v. Wilson*, No. 16-20769 (by Judge Roberts), and (2) the maximum ending date of the cumulative 240-month term imposed in this case exceeds the maximum ending date of the terms imposed in the defendant's other cases.

On June 8, 2017, the petitioner was sentenced in file number 16-20724 to 50 months in prison. *See* Judgment, ECF No. 22. On August 30, 2017, the petitioner was sentenced in file number 16-20769 to 24 months in prison for possession of and conspiracy to possess counterfeit or unauthorized access devices, followed by a consecutive 24-month term for aggravated identity theft. The first 24-month term was ordered to run concurrently to the 50-month term imposed in case number 16-20724, and the second sentence of 24 months for aggravated identity theft was ordered to run consecutively to the 24 months imposed for the first two counts and also consecutively to the 50 months imposed under file number 16-20724.

On January 23, 2019, the petitioner was sentenced by this Court to concurrent terms of 120 months in prison on counts one and three. The Court ordered the sentences on counts one and three to run concurrently with the undischarged sentences of 50 months under file number 16-20724 and also concurrently with the cumulative total of 48 months imposed under file number 16-20769. Sentencing Hrg. Tr., ECF No. 69, PageID.315. The Court also imposed a consecutive 120-month term of imprisonment on count four, for a total custodial term in this matter of 240 months.

Based on the above undisputed judgments of conviction, the sentence imposed by Judge Cleland began to run on June 8, 2017 and ended on August 7, 2021. The first 24-month concurrent term imposed by Judge Roberts commenced on August 30, 2017 and ended on August 29, 2019. However, because the 50-month term ended later than the initial 24-month term imposed by Judge Roberts, the second 24-month consecutive term imposed by Judge Roberts is tacked onto the end of the 50-month term imposed by Judge Cleland — as expressly specified in the judgment in the Judge Roberts case — and that second term therefore ends on August 7, 2023.

This Court imposed a sentence of 120 months concurrent to any unexpired term of imprisonment and other terms in this case, which began running on January 23, 2019 and ends on January 22, 2029. The Court imposed an additional term of 120 months consecutive to the first 120-month sentence, which results in a total term of 240 months in prison, commencing on January 23, 2019 and ending on January 22, 2039. The maximum ending date for the total term imposed in this case therefore falls well beyond the end of the other previously imposed terms of imprisonment, and it has not been improperly extended by tacking on to any other unexpired terms.

The publicly available records of the BOP presently indicate that the defendant is scheduled to be released from prison on April 5, 2035 — almost four years before the maximum end date of

the total term of custody imposed by this Court. There is no evidence that the BOP has calculated that date improperly or failed to allow proper credit for time served on other sentences.

III.

The petitioner has not established that his convictions and sentence are infirm in any way or that he received constitutionally inadequate representation in this Court. His contention that the Bureau of Prisons must recalculate his sentence is not reviewable in this Court.

Accordingly, it is **ORDERED** that the petitioner's motion to vacate sentence (ECF No. 72) is **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Date:   March 20, 2023